**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MATTHEW RIVETTI, NATALIE FELIZ, and SHAMROZE MOOSA on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>    vs.<br><br>AMERICAN EXPRESS COMPANY; TAMMY YEE; THE RETIREMENT SAVINGS PLAN INVESTMENT COMMITTEE; and DOES 1-30,<br>         Defendants. | Case No. _____ |

## CLASS ACTION COMPLAINT

Plaintiffs Matthew Rivetti, Natalie Feliz, and Shamroze Moosa ("Plaintiffs"), individually and as representatives of a class of participants and beneficiaries of the American Express Retirement Savings Plan (the "Plan"), by and through undersigned counsel, allege the following against Defendants American Express Company ("Amex"); Tammy Yee, Vice President, Global Well-Being and Benefits ("Yee"); the Retirement Savings Plan Investment Committee (the "Investment Committee" or "RSPIC"); and John and Jane Does 1-30 (collectively, "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel, review of public documents, and analysis of data as to all other matters:

## NATURE OF THE ACTION

1.    This action arises from protracted breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, committed by the fiduciaries of the Plan, a defined contribution retirement 401(k) plan.

2.    As of December 31, 2024, the Plan had nearly $9 billion in assets and nearly 40,000 participants with account balances, placing it in the top 0.03% of all defined contribution ("DC") plans by plan size. At all times throughout the class period, the Plan was larger than 99.6% of DC plans in terms of assets and participants. DC plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand the highest-quality, lowest-cost investment options available in the marketplace—including access to institutional share classes, top-tier index funds, and competitively managed active funds that consistently meet or exceed their benchmarks.

3.    ERISA imposes upon Plan fiduciaries the highest duties known to the law. *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Those duties require fiduciaries to act with the care, skill, prudence, and diligence of a prudent expert, to act solely in the interest of Plan participants, and to monitor and remove imprudent investments within a reasonable time. *See* 29 U.S.C. §§ 1104(a)(1)(A)–(B); *Hughes v. Nw. Univ.*, 595 U.S. 170, 175 (2022) (explaining that the Supreme Court has "interpreted ERISA's duty of prudence in light of the common law of trusts and determined that 'a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones'") (citing *Tibble v. Edison Int'l*, 575 U.S. 523 (2015)).

4.    As fiduciaries, Defendants had an obligation to prudently curate a menu of investment options for the Plan. They must regularly monitor those investment options and remove ones that can no longer be prudently included in the Plan's investment lineup. The Plan's

participants, who are mostly current and former Amex employees, can only invest their retirement savings in the funds that the Defendants select for the Plan.

5.      Defendants systematically failed those responsibilities. During the Class Period,[1] Defendants selected and retained investment options in the Plan that persistently and substantially underperformed their benchmarks and comparable alternative investments available in the marketplace. Defendants' failures caused Plan participants to lose hundreds of millions of dollars in retirement savings that a prudent and loyal fiduciary would have preserved.

6.      The challenged investment options are: (1) The Retirement Fund Series—the Plan's suite of custom target date funds serving as its Qualified Default Investment Alternative ("QDIA"), encompassing eight vintages from the Retirement Fund 2025 through the Retirement Fund 2060 (collectively, the "Amex TDF Series"); (2) The U.S. Large-Cap Equity Fund (the "Large-Cap Fund"); and (3) The International Equity Fund (the "IEF"), (collectively, the "Challenged Funds").

7.      Each of the Challenged Funds underperformed its prospectus benchmark and peer funds in the same Morningstar category with similar risks and rewards during the Class Period and even years beforehand. The peer funds compete in the same Morningstar category as each Challenged Fund, using objective criteria including fund size, investment strategy, and portfolio composition. This pattern of persistent, multi-front underperformance across four separate investment categories, sustained over the entirety of the Class Period without remedial action, is compelling evidence that Defendants' process for selecting and monitoring the Plan's investments was fundamentally flawed or effectively nonexistent.

8.      This case involves more than imprudence. Amex TDF Series are custom funds investing almost entirely in other Challenged Funds, effectively compounding the harm:

---

[1] The Class Period refers to six years before the filing of the complaint through judgment.

participants defaulted into the Amex TDF Series by the Plan were exposed to the persistent underperformance of three other Challenged Funds simultaneously.

9. Defendants' failure to act was compounded by a material conflict of interest. The IEF fund and certain Core Funds comprising the Amex TDF Series allocate significant assets to Morgan Stanley Investment Management, Inc. Amex and Morgan Stanley maintain a multifaceted business relationship—including a co-branded credit card partnership renewed as recently as December 2023 and Morgan Stanley's role as a Joint Book-Running Manager for Amex debt offerings. Amex's own Form 11-K identifies Morgan Stanley as a party-in-interest to the Plan. This relationship creates a plausible inference that Defendants' retention of Morgan Stanley sub-advisors was influenced by considerations other than participants' exclusive benefit, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

10. Based on conservative estimates using publicly available data, the Challenged Funds' underperformance relative to readily available alternatives caused losses to the Plan of hundreds of millions of dollars during the Class Period, with exact losses to be determined through discovery. These losses could have been entirely avoided had Defendants fulfilled their obligations under ERISA to act as prudent and loyal fiduciaries.

11. To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate. Plaintiffs,

individually and as representatives of a class of participants and beneficiaries of the Plans, also bring their claims under 29 U.S.C. § 1132(a)(3) for appropriate equitable relief.

## PARTIES

### A. Plaintiffs

12.     Plaintiff Matthew Rivetti is an individual residing in Elyria, Ohio. From approximately 2021 through 2024, Mr. Rivetti was employed by Amex as a Senior Client Manager. During his employment, Mr. Rivetti participated in the Plan and his individual account was invested in all Challenged Funds. Specifically, Mr. Rivetti was invested in the Amex TDF Series 2055 vintage, which in turn held all of the other Challenged Funds including the Large-Cap Fund and the IEF Fund. Mr. Rivetti also held the Large-Cap Fund separately.

13.     Plaintiff Natalie Feliz is an individual residing in Florida. From approximately 2019 through 2024, Ms. Feliz was employed by Amex as a License, Specialty, Consumer Banking Expert. During her employment, Ms. Feliz participated in the Plan and her individual account was invested in the Amex TDF Series 2060 vintage, which in turn held all of the other Challenged Funds, the Large-Cap Fund and the IEF fund.

14.     Plaintiff Shamroze Moosa is an individual residing in Georgia. From approximately 2020 through 2023, Ms. Moosa was employed by Amex as director of operation customer service. During employment, Ms. Moosa participated in the Plan and her individual account was invested in the Amex TDF Series 2050 vintage, which in turn held all of the Challenged Funds, the Large-Cap Fund and the IEF Fund. Ms. Moosa was also held the Large-Cap Fund separately.

15.     Plaintiffs are "participants" in the Plan within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7).

**B.  Defendants and the Plan**

16.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34) that covers eligible employees of Amex and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1003(a).

17.    Defendant Amex is a multinational financial services corporation organized and existing under the laws of the State of New York, with its principal place of business at 200 Vesey Street, New York, New York 10285.

18.    Amex is a Fortune 100 company with approximately 76,800 employees worldwide and generated approximately $80.5 billion in annual revenue in 2025.

19.    Amex is the Plan Sponsor of the American Express Retirement Savings Plan within the meaning of ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B).

20.    Defendant Investment Committee is the committee appointed to oversee the Plan's investments, including the selection, monitoring, and removal of the Plan's investment options. The members of the Investment Committee are named fiduciaries of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a)(2), and are fiduciaries pursuant to ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A), by virtue of their discretionary authority and control over Plan assets. The Investment Committee is specifically responsible for the decisions at the center of this case—the selection and retention of the Challenged Funds.

21.    Defendant Yee is the Vice President, Global Well-being and Benefits (previously titled Vice President, Global Benefits), who is a named fiduciary of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a)(2) with authority to appoint, remove, and monitor Investment Committee members.

22.     Defendants Amex and Yee had fiduciary duties to monitor the performance of the Investment Committee and take remedial action where the members of the Investment Committee failed to fulfill their fiduciary obligations.

23.     Defendants John and Jane Does 1-30 are current and former members of the Investment Committee, and other individuals or entities who served as fiduciaries of the Plan during the Class Period, whose identities are not currently known to Plaintiffs despite reasonable investigation. The membership of the Investment Committee and the identities of other Plan fiduciaries are not publicly disclosed. As soon as practicable after their identities are ascertained through discovery, Plaintiffs will move to amend this Complaint pursuant to Federal Rule of Civil Procedure 15 to name them individually.

24.     At all relevant times, Defendants exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority or control respecting management or disposition of Plan assets, making them fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). To the extent any Defendant delegated fiduciary responsibilities to another person or entity, the person or entity to whom such responsibilities were delegated also became a fiduciary under 29 U.S.C. § 1002(21)(A), and is named as a Doe Defendant.

## JURISDICTION, VENUE, AND STANDING

25.     This Court has exclusive jurisdiction pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331, because this action arises under the laws of the United States and specifically seeks relief under ERISA, a federal statute.

26.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because Amex is headquartered and has its principal place of business in this District at 200 Vesey Street, New York, New York 10285. The Plan is also administered in this District,

and a substantial portion of the acts and omissions giving rise to the claims asserted herein occurred in this District.

27.    Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries through the diminishment of their individual Plan accounts by the Challenged Fund's underperformance. These injuries are fairly traceable to Defendants' unlawful conduct and the harms are likely to be redressed by a favorable judgment providing relief to the Plan.

28.    Having established Article III standing, Plaintiffs may seek recovery for the entire Plan under 29 U.S.C. § 1132(a)(2).

29.    Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the imprudent retention of the Challenged Funds) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

30.    To the extent the Plan still contains an arbitration clause, such clause is no longer enforceable as applied to Plaintiffs' claims for plan-wide relief under ERISA Sections 502(a)(2) and 409(a). Under controlling Second Circuit precedent, a plan's mandatory arbitration provision that precludes participants from seeking plan-wide monetary relief is unenforceable under the effective vindication doctrine. *See Cedeno v. Sasson*, 100 F.4th 386 (2d Cir. 2024). Because Plaintiffs' claims seek restoration of losses to the Plan as a whole—not merely individual relief— the Plan's arbitration and class action waiver provisions cannot be enforced to bar this action.

## **ERISA FIDUCIARY STANDARDS**

31.    ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Amex Plan, that are covered by ERISA.

32.     Defendants are required by ERISA to: "discharge [their] duties with respect to a plan *solely* in the interest of the participants and beneficiaries and – (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1), (B), 29 U.S.C. § 1104(a)(1)(B) (emphasis added).

33.     ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

34.     ERISA's fiduciary duties are the "highest known to the law." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

35.     The duty of prudence imposed by 29 U.S.C. § 1104(a)(1)(B) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021) (internal quotations omitted).

36.     A fiduciary's decision-making process is always evaluated based on "the circumstances then prevailing", *i.e.,* the facts the fiduciaries knew at the time or should have known had they employed a prudent process. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

37.     "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote,* 9 F.4th at 108.

9

38.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. ERISA Section 405, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enabling breaches by other fiduciaries.

39.     Under ERISA, a person is a fiduciary to the extent he or she: (1) is a named fiduciary in the documents establishing the plan; (2) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (3) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (4) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); ERISA Section 402(a), 29 U.S.C. § 1102(a)(2).

## ERISA FIDUCIARY DUTIES AS APPLIED TO INVESTMENT MONITORING

40.     ERISA fiduciaries must develop a method for selecting and reviewing the investments for a defined contribution plan. For a fiduciary, like the Investment Committee, making independent investigations about the merits of investments is at the heart of the prudent person standard. *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985) (citing *Donovan v. Bierwirth*, 538 F. Supp. 463, 470 (E.D.N.Y. 1981)); *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988).

41.     Although no specific methodology is mandated by ERISA, a fiduciary develops one and comes to conclusions based on the relative clarity of the data, the strengths and risks of each investment, and weighs those investments against the respective universe of investments available at the time. In addition, since a fiduciary takes on the highest form of trust and duty, an asset beneficiary should expect each and every fiduciary to have a very high level of subject matter

10

expertise. This is particularly true where, as here, those fiduciaries are entrusted with authority over billions of dollars in retirement assets.

42.     Underperformance of a fund for one year is a cause for scrutiny and investigation. Underperformance of three or more consecutive years is a cause for alarm and typically demands remedial action, including a careful analysis regarding the merits and options regarding replacement of the fund. Underperformance across six consecutive years, as occurred here with all the Challenged Funds, is an unmistakable signal of failure that any competent and attentive fiduciary would have acted upon.

43.     When a fiduciary relationship is established and prudence must be exercised, a fiduciary is obligated to analyze various data points to assess the likelihood that chosen investment options are in the sole interest of the plan participants, including performance against fund benchmarks and as against other similar investments available in the marketplace.

44.     Utilizing either the 3- and/or 5-year search parameters is a widely accepted starting points for narrowing down investment options. Prudent fiduciaries will further investigate each investment option by looking at the investment's 3/5-year return statistics. Returns are assessed against (1) investments in the same category; (2) the relevant benchmark; and (3) investments available at the time the investment options are assessed.

45.     While no one can predict exactly which investments will out-perform other investments, prudence requires, at a minimum, examining investments for appropriate factors such as the risk of loss, the opportunity for return, diversification, liquidity, current return and projected return. DOL guidance states that appropriate consideration or alternatively, procedural due diligence, means ensuring investment decisions are reasonable, and applicable to the plan's design:

> Appropriate consideration shall include, but is not necessarily limited to, (i) A determination by the fiduciary that the particular investment or investment course

of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action.

29 C.F.R. § 2550.404a-1.

46.    Fiduciary duties do not end at the selection process. There is a continuing duty to monitor investments or service providers after the selection process, and to remove imprudent ones. *Tibble*, 575 U.S. at 529 ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset").

47.    Details about a fiduciary's methods and actual knowledge regarding investment decisions tend to be in the fiduciary's sole possession. *See Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, No. 21 CIV. 8384 (KPF), 2024 WL 2815980, at *4 (S.D.N.Y. May 31, 2024); *Sacerdote*, 9 F.4th at 107 ("[W]e are cognizant that 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'"); *PBGC v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 719-20 (2d Cir. 2013); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences."). ERISA imposes disclosure requirements on plan administrators, which are supposed to give plan beneficiaries "the opportunity to find out how the fiduciary invested the plan's assets." *PBGC*, 712 F.3d at 720.

48.    The standard of care applicable to fiduciaries of a plan the size of the Amex Plan is particularly demanding. A prudent fiduciary of a $9 billion plan is expected to conduct rigorous, ongoing quantitative and qualitative analysis of each investment option; to benchmark each fund against its prospectus benchmark and relevant peer group on a rolling basis; to identify

12

underperformance promptly; to investigate its causes; and to take corrective action—including removal of the investment—when the evidence of persistent underperformance is clear.

49.    The goal of an active manager is to beat a benchmark—usually a market index or a combination of indices—by taking more risk than the relevant index or indices.[2] It is a basic principle of investment theory that the risks associated with an investment must be justified by its potential returns for that investment to be rational. This principle applies even before considering the purpose of the investment or the needs of an investor. The Capital Asset Pricing Model ("CAPM")—which is a well-established model used to price securities and generate expected returns for assets given their risks and the cost of capital—provides the following mathematical formula for this principle: $ERi = Rf + \beta i(Erm - Rf)$, where: $ERi$ = the expected return of the investment; $Rf$ = the risk-free rate; $\beta i$ = the beta of the investment; $(Erm - Rf)$ = the market risk premium.

50.    Beta tracks the risk associated with actively managed investments, which is only justified if the return is above its benchmark which is risk free.

51.    It defies economic sense to agree to additional risk without expectation of achieving higher return than the risk-free benchmark.

---

[2] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*, SmartAsset Advisor, LLC (Feb. 16, 2023), https://smartasset.com/financial-advisor/active-management (last visited April 29, 2026) ("[t]he goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers"); Lehman and Modest, Mutual Fund Performance Evaluation: A Comparison of Benchmarks and Benchmark Comparisons, Journal of Finance, Vol. XLII, No. 2, June 1987 (evaluating the performance of benchmarks using CAPM and APT, and explaining that the entire purpose of actively managed mutual funds is to exceed the performance of an index/benchmark); Baks, Metrick, and Wachter, Should Investors Avoid All Actively Managed Mutual Funds? A Study in Bayesian Performance Evaluation, Journal of Finance, Vol. LVI, No. 1, February 2001 (observing that, since Jensen in 1968, "most studies have found that the universe of mutual funds does not outperform its benchmarks after expenses" and "evidence indicates that the average active mutual fund should be avoided"); Jensen, The Performance of Mutual Funds in the Period 1945-1964, Vol. XXIII, No. 2, May 1968 (explaining that most actively managed mutual funds do not outperform indexes and that only those that outperform indexes can justify the risk and expense from an economic perspective).

52.     Thus, CAPM specifically contemplates the comparison of an investment to an applicable index benchmark. This is a valuable data point to a prudent investor. Suggestions that an actively managed fund cannot be compared to its applicable index benchmark in every instance thus ignore the fundamental purpose and design of active investments—that aim to beat their applicable, risk free, index benchmark.

53.     The assumption that under all circumstances a comparison of an applicable index to an active investment is somehow an "apples to oranges" comparison flies in the face of basic investment theory.

54.     In fact, every ERISA participant disclosure under 29 C.F.R. § 2550.404a-5 includes active investment comparisons to an applicable index benchmark, because this comparison is so inherent and basic to investment theory.

55.     To be clear, the Complaint does not challenge the selection of actively managed investments and does not challenge active management specifically or in general. As explained above, there is nothing inherently wrong with choosing actively managed funds, as long as the expected return of the fund justifies the increased expense and risk, as compared to other readily available investment options. In other words, to justify choosing an actively managed investment, fiduciaries of a retirement plan must, at a minimum, engage in rational economic decision-making to justify the more expensive and inherently riskier investment.

56.     Here, the fiduciaries' process must have irrationally ignored these basic investment processes because they continued to retain investments that failed this basic investment test.

14

## FACTS APPLICABLE TO ALL COUNTS[3]

### A. The Plan and Its Investment Menu

57.    The Plan is an individual account, defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Amex for the sole benefit of its eligible employees.

58.    Throughout the Class Period the plan ranged from approximately 35,000 (2020) to 38,000 (2024) participants and had Plan assets from $7.1 billion (2020) to over $9 billion (2024). Throughout the class period the Plan has been larger than over 99.6% of all defined contribution plans.

59.    As an individual account, defined contribution retirement plan, a participant's retirement benefit in the Plan equals (1) the amount of the participant's voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses paid to third-party service providers. *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1025-1026 (2025) (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses").

60.    The Plan's investment menu is organized in three tiers. Tier 1 consists of the Amex TDF Series, which serves as the Plan's QDIA—the default investment for participants who do not make an active election. Tier 2 consists of core investment options including the Large-Cap Equity

---

[3] All factual assertions in this section are taken from: (1) documents provided by Defendants to Plaintiffs' counsel, including the Plan's operative governing documents during the class period and the Plan's summary plan description; (2) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; (3) documents provided by Plaintiffs; and publicly available investment documents that would have been readily available to the Investment Committee.

Fund, and the International Equity Fund, among others. Tier 3 consists of the American Express Company Stock Fund and a self-directed brokerage account.

61.    The Investment Committee selects the investment options that make up Tiers 1 and 2 from which the Plan participants may select.

62.    Plan participants may only invest their Plan balance in investments selected by the Investment Committee for the Plan's investment menu.

<b>The Investment Committee Imprudently and Disloyally<br><u>Retained The Challenged Funds Despite Years of Poor Performance</u></b>

**A.  Challenged Funds–Amex TDF Series**

63.    The Amex TDF Series consists of ten custom vintages: the Retirement Fund 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, 2060, and The Retirement Income Fund. Plaintiffs' allegations focus on the eight most relevant vintages—Retirement Fund 2025 through Retirement Fund 2060—as the funds in which Plaintiffs and the class members are or have been invested during the Class Period. The Amex TDF Series has been offered as an investment option in the Plan since at least 2006.

64.    The Amex TDF Series serves as the Plan's QDIA under 29 C.F.R. § 2550.404c-5. As the QDIA, the Amex TDF Series is the default investment for all Plan participants who do not affirmatively elect an alternative—a category that includes a substantial portion of the Plan's participant base, particularly newer employees and those who are less engaged with their investment elections. The QDIA status of the Amex TDF Series means that the Investment Committee's decision to retain it directly and automatically affected the retirement savings of thousands of participants who never chose it.

65.    The typical allocation to QDIA investments is between 25% and 40% of plan assets. Given the over $8 billion in assets held by the Plan, Plaintiffs conservatively estimate that the

Retirement Fund Series holds approximately $2 billion in participant assets, making it by far the largest single investment allocation in the Plan.

66.    The Amex TDF Series is structured as custom funds-of-funds: each TDF vintage invests primarily in four core funds within the Plan—the Large-Cap Equity Fund, the International Equity Fund, the Small/Mid-Cap Equity Fund, and the Diversified Bond Fund.

67.    The underperformance of the core equity funds identified in this Complaint was not confined to those individual funds; rather, that underperformance was transmitted through and amplified across the target-date fund family via the fund-of-funds structure.

68.    Each Amex TDF Series vintage held allocations to multiple Challenged Funds, and accordingly, the underperformance of these underlying core equity funds directly reduced the returns experienced by all participants invested in the relevant TDF vintages. The effect of this structure is to propagate the underperformance from the underlying core funds into multiple TDF vintages simultaneously, and to amplify the harm across a broader cohort of plan participants than would have suffered had they been directly invested in the core equity funds.

69.    Defendants' dual breach—retaining both the underperforming core equity funds and the TDF funds that held those core funds—subjected Amex Plan participants to compounded exposure to Defendants' imprudent investment decisions.

### 1.    Target Date Funds General

70.    A target date fund ("TDF"), like the Amex TDFs, is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the participant's assumed target retirement year approaches. These shifts occur along what is known as a TDF's "glide path." TDFs, when prudently managed, offer investors dynamic, straightforward asset allocation, while providing both long-term growth and

capital preservation. All TDFs are inherently actively managed, because managers make changes to the allocations to stocks, bonds, and cash over time.

71.    TDF glide paths are managed either "to" or "through" retirement. A "to retirement" glide path generally assumes participants will withdraw their funds once they reach the presumed retirement age, or soon thereafter. The asset allocation of a "to retirement" TDF remains static once the retirement date is reached. A "through retirement" glide path expects participants will remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a "through" TDF is not reached until a predetermined number of years after the target date.

72.    "To retirement" strategies are managed to protect against the risk of a market decline significantly diminishing assets, while the "through retirement" approach focuses on the risk of outliving savings. Each strategy treats the other's primary focus as a secondary objective (i.e., most "to" managers "have the objective of limiting portfolio volatility up to retirement as the primary goal, and the income throughout retirement is more of a secondary objective."). TDFs designed to take investors "to retirement" typically de-risk faster than their "through retirement" peers, While this may offer greater potential protection against downside risk, it leaves investors exposed to the potential consequences of running out of money in retirement. As retirees trend toward keeping savings in their retirement plans post-retirement, "through retirement" glide paths have been more widely utilized.[4]

73.    The underlying mutual funds that TDF managers choose to populate each asset class can be actively or passively managed. This refers to a TDF's "implementation." TDFs that are implemented with underlying passively managed assets are still, themselves, actively managed.

---

[4] Amanda Umpierrez, Evaluating 'To' vs. 'Through' Glide Paths, PLANSPONSOR, (Feb. 17, 2021), https://www.plansponsor.com/in-depth/evaluating-vs-glide-paths/ (last visited May 1, 2026).

TDFs made up of primarily or entirely passive assets provide broad market exposure at minimal cost and can avoid the risk of active management underperformance and style drift. TDFs composed of actively managed funds tend to provide more diversified asset class exposure while offering the potential for excess returns, particularly in less efficient asset classes where active management tends to outperform.

### 2. TDF Underperformance vs. Benchmarks

74.    The Amex TDF Series is benchmarked against both the "Amex Benchmark"—a composite of the underlying benchmark indices weighted by the Amex TDF Series target allocation—and the S&P Target Date Index ("S&P Index") for the relevant vintage year.

75.    The Amex Benchmark is not an independent or externally imposed standard. It is a blended index constructed and selected by the Plan's fiduciaries themselves, calculated by weighing the returns of underlying indices according to each Retirement Fund's own target asset allocation percentages. In other words, it is the benchmark the Plan's fiduciaries chose to judge their own performance.

76.    The S&P Target Date Index TR is a widely recognized, multi-asset class industry index that corresponds to a particular target retirement date and serves as a broad market standard for evaluating target date funds.

77.    The following chart sets forth the annualized total returns for each of the Amex TDFs against both benchmarks for the one-year, three-year, and five-year periods ending March 31, 2025, as reported in the Plan's 2025 Summary Plan Description that was provided to all Plan participants.

19

**Table 1: Amex TDF Series vs. Benchmarks**

| Fund Name | 1-Year | | | 3-Year | | | 5-Year | | | Beat Amex Benchmark? | Beat S&P Target Date Index? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fund Return | Amex Benchmark | S&P Index | Fund Return | Amex Bench mark | S&P Index | Fund Return | Amex Benchmark | S&P Index | | |
| The 2025 Retirement Fund | 4.54% | 5.35% | 5.83% | 3.15% | 3.69% | 4.13% | 8.43% | 8.65% | 8.72% | No | No |
| The 2030 Retirement Fund | 4.56% | 5.34% | 5.94% | 3.47% | 3.96% | 4.69% | 9.09% | 9.45% | 10.19% | No | No |
| The 2035 Retirement Fund | 4.61% | 5.43% | 6.01% | 3.86% | 4.37% | 5.21% | 9.74% | 10.28% | 11.74% | No | No |
| The 2040 Retirement Fund | 4.50% | 5.44% | 6.11% | 4.21% | 4.77% | 5.73% | 10.41% | 11.10% | 12.93% | No | No |
| The 2045 Retirement Fund | 4.41% | 5.45% | 6.12% | 4.38% | 5.01% | 6.08% | 11.52% | 12.38% | 13.66% | No | No |
| The 2050 Retirement Fund | 4.22% | 5.33% | 6.20% | 4.51% | 5.20% | 6.27% | 12.12% | 13.13% | 14.03% | No | No |
| The 2055 Retirement Fund | 4.14% | 5.33% | 6.19% | 4.66% | 5.39% | 6.28% | 12.23% | 13.31% | 14.16% | No | No |
| The 2060+ Retirement Fund | 4.14% | 5.33% | 6.16% | 4.66% | 5.39% | 6.30% | 12.22% | 13.31% | 14.17% | No | No |

78.     As the table makes plain, not a *single* Amex TDF vintage outperformed *either* benchmark over *any* of the three time periods shown. Every fund trailed the Amex Benchmark— the standard the Plan's own fiduciaries selected—across the one-year, three-year, and five-year periods. The underperformance was not marginal: the equity-heavy funds for participants furthest from retirement lagged the S&P Target Date Index by more than one percentage point annually over the five-year period, a gap that compounds dramatically over a working lifetime of retirement savings.

79.    Critically, this pattern of sustained, across-the-board underperformance is not the result of a single difficult year or market anomaly. It is consistent across every vintage of the fund series and across every measurement period, reflecting a structural failure in the selection and retention of the funds' underlying investments—a failure that a prudent fiduciary monitoring these funds against their own chosen benchmarks would have identified and remedied.

### 3. *Amex TDF Underperformance vs. Comparator Funds*

80.    In addition to underperforming their benchmarks, the Amex TDFs persistently underperformed a peer group of the five most prominent and similar off-the-shelf TDF suites available in the marketplace.

81.    Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2024, there were only 37 established TDFs that had a 15-year track record.[5] A closer look reveals that, as shown below, assets are highly concentrated in the top 5 largest TDFs, which accounted for 80% of all TDF-invested dollars as of 2024.

82.    At the beginning of the class period there were even fewer established options and concentration was similar in the top 5 options.

---

[5] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 13.

**Exhibit 13** The 10 Largest Target-Date Providers

| Firm | Target-Date Series | Assets (USD in Billions) | | | Market Share | |
|---|---|---|---|---|---|---|
| | | Mutual Fund | CIT | Total TDF | 2021 | 2020 |
| **Vanguard** | | | | 1,190 | 36.4% | 36.7% |
| | Vanguard Target Retirement | 660 | 530 | | | |
| **Fidelity** | | | | 460 | 14.1% | 13.3% |
| | Fidelity Freedom | 221 | — | | | |
| | Fidelity Freedom Index | 106 | 46 | | | |
| | Fidelity Freedom Blend | 11 | 55 | | | |
| | Fidelity Advisory Freedom | 21 | — | | | |
| | Fidelity Flex Freedom Blend | <1 | — | | | |
| | Fideity Managed Retirement | <1 | — | | | |
| **T. Rowe Price** | | | | 374 | 11.5% | 11.6% |
| | T. Rowe Price Retirement | 180 | 170 | | | |
| | T. Rowe Price Target | 4 | 1 | | | |
| | T. Rowe Price Retirement Hybrid | — | 16 | | | |
| | T. Rowe Price Retirement Blend | <1 | 4 | | | |
| **BlackRock** | | | | 289 | 8.8% | 9.5% |
| | BlackRock LifePath Index | 61 | 226 | | | |
| | BlackRock LifePath Dynamic | 1 | 1 | | | |
| | BlackRock LifePath ESG Index | <1 | — | | | |
| **American Funds** | | | | 248 | 7.6% | 7.2% |
| | American Funds Target Date Retirement | 239 | 9 | | | |

83.     Further, Morningstar noted that "in practice, there doesn't seem to be a large difference in how investors use the different glide-paths."[6]

84.     The five comparators—the T. Rowe Price Retirement Series, the Fidelity Freedom Series, the Vanguard Target Retirement Series, the American Funds Target Date Retirement Series and the BlackRock LifePath Index Series—are the top 5 largest TDFs. This means investors have consistently allocated the large majority of TDF dollars among these options and they were among the leading candidates for TDF selection for the class period. The comparators are by no means fringe options and Amex could have at all times retained one of them.

85.     The standard of care applied by prudent fiduciaries when monitoring and evaluating plan investment options would have considered some of the largest leading options for one of the largest Plans, Amex. Further, the peer comparators have (i) the same Morningstar target-date

---

[6] 2022 Target-Date Strategy Landscape.

category as the corresponding Amex vintage; (ii) similar glide-path structure—four of the five comparators employ a through-retirement design, while the BlackRock LifePath Index Series employs a to-retirement design, albeit as Morningstar noted in reality investors do not treat them differently; (iii) comparable equity allocation and risk profile at each vintage; and (iv) institutional availability and scale, with each comparator series managing between $11 billion and $118 billion per vintage. Collectively, the five comparator series represent the five largest target-date fund families in the United States by assets under management and are among the most widely held investment options in employer-sponsored retirement plans nationwide. They are the funds that a prudent fiduciary benchmarking the Amex TDFs would have examined as a matter of course. A practical consequence of the to-retirement design is that BlackRock LifePath Index 2025 Fund closed on October 7, 2024, upon reaching its target date; current trailing return data is therefore unavailable, and the BlackRock series is included as a comparator for the 2030 through 2060 vintages only.

86.     The exhibits below demonstrate that the Amex TDFs have underperformed all five comparator funds on a three-year and five-year trailing basis across every vintage in the Series—a pattern of systematic, plan-wide underperformance that cannot be attributed to market conditions, asset class exposure, or any single vintage-specific factor. Critically, this underperformance persists even against comparator funds that charge materially higher expense ratios than the Amex TDF funds. For example, the Fidelity Freedom Series charges between 0.59% and 0.69% annually—nearly double the 0.29% to 0.38% charged by the Amex Series—yet outperforms the Amex funds across every vintage and every measured time period. The Vanguard Target Retirement Series, which charges just 0.08% annually, outperforms the Amex Series by an

even wider margin on a five-year basis across most vintages, demonstrating that the underperformance is driven by manager selection and investment quality, not by cost.

87.     The breadth and consistency of this underperformance—eight vintages, five comparators, multiple time horizons—reflects not random variation but a structural failure of the fiduciary process by which the Amex Investment Committee selected and retained the underlying investment managers comprising the Series.

88.     The following exhibits set forth the annualized total returns for each of the eight vintages comprising the Amex TDFs against the five independently selected comparator funds for the one-year, three-year, five-year, and ten-year periods ending December 31, 2025. It also shows, as an example, what Plan participants would have earned in returns on $250 million in assets if they were invested in the other comparable and prudent funds. All comparator performance data is annualized as of December 31, 2025, as reported in each fund's most recent fact sheet and prospectus.

89.     The data below reflects a different measurement date than the benchmark comparison set forth in the preceding paragraph, which is drawn from the Plan's own 2025 SPD as of March 31, 2025 (*i.e.*, Table 1). The two datasets are complementary: the SPD data reflects the underperformance disclosed by Amex itself to Plan participants under its own fiduciary-selected benchmarks, while the comparator analysis reflects current trailing returns against independently selected peer funds. Both analyses independently confirm the same conclusion—that the Amex TDF Series has consistently underperformed appropriate benchmarks and available alternatives across all vintages and all relevant time periods.

**Table 2: Amex TDF 2025 vs. Comparators[7]**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| **The 2025 Retirement Fund (Amex)** | 12.56% | 10.8% | 4.28% | — | — | — | — |
| T. Rowe Price (TRRHX) | 12.98% | 12.4% | 6.02% | +1.60 pp | +1.74 pp | $12M | $22M |
| Fidelity (FFTWX) | 16.46% | 12.87% | 5.69% | +2.07 pp | +1.41pp | $16M | $18M |
| Vanguard (VTTVX) | 14.6% | 12.84% | 5.9% | +2.04 pp | +1.62 pp | $15M | $20M |
| Am. Funds (RFDTX) | 14.52% | 11.91% | 6.39% | +1.11pp | +2.11 pp | $8.3M | $26M |

90.     The Amex 2025 Fund has materially and consistently underperformed its fiduciary-selected benchmark and all comparator funds across the relevant time periods. The Fund returned 10.8% on a trailing three-year basis and 4.28% on a trailing five-year basis, lagging its own benchmark by 89 and 149 basis points respectively.

91.     When measured against the comparator funds—the T. Rowe Price Retirement 2025 Fund (TRRHX), Fidelity Freedom 2025 Fund (FFTWX), Vanguard Target Retirement 2025 Fund (VTTVX), and American Funds 2025 Target Date Retirement R6 (RFDTX)—the Fund trailed every comparator over the three-year and five-year periods by between 111 and 207 basis points on a three-year basis and between 141 and 211 basis points on a five-year basis.

92.     A $250 million investment in any of the comparators would have produced between approximately $8.3 million and $16 million more in returns over three years, and between approximately $18 million and $26 million more in returns over five years.

---

[7] BlackRock LifePath Index 2025 Fund N is excluded from this comparison because the fund was reorganized into the BlackRock LifePath Index Retirement Fund on October 7, 2024, prior to the December 31, 2025, measurement date used throughout this analysis.

**Table 3: Amex TDF 2030 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| The 2030 Retirement Fund (Amex) | 14.08% | 12.2% | 4.77% | — | — | — | — |
| T. Rowe Price (TRRCX) | 14.38% | 13.77% | 6.78% | +1.57 pp | +2.01 pp | $12M | $25M |
| Fidelity (FFFEX) | 17.68% | 14.04% | 6.54% | +1.84 pp | +1.77 pp | $14M | $22M |
| Vanguard (VTHRX) | 16.24% | 14.27% | 6.83% | +2.07 pp | +2.06 pp | $16M | $26M |
| Am. Funds (RFETX) | 15.72% | 13.68% | 7.28% | +1.48 pp | +2.51 pp | $11M | $31M |
| BlackRock LifePath | 14.2% | 12.5% | 5.93% | +0.31pp | +1.16pp | $2.3M | $14.5M |

93.     The 2030 Retirement Fund has materially and consistently underperformed its benchmark and all five comparator funds over the periods relevant to this analysis.

94.     The Fund returned 12.2% on a trailing three-year basis and 4.77% on a trailing five-year basis, trailing its own benchmark by 90 and 174 basis points respectively.

95.     Against the comparator funds—T. Rowe Price Retirement 2030 (TRRCX), Fidelity Freedom 2030 (FFFEX), Vanguard Target Retirement 2030 (VTHRX), American Funds 2030 Target Date Retirement R6 (RFETX), and BlackRock LifePath Index 2030—the Fund lagged by between 31 and 207 basis points over three years and between 116 and 251 basis points over five years. A $250 million investment in any of the five comparators would have produced between approximately $2.3 million and $16 million more in returns over three years, and between approximately $14.5 million and $31 million more in returns over five years.

**Table 4: Amex TDF 2035 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| The 2035 Retirement Fund (Amex) | 15.62% | 13.67% | 5.35% | — | — | — | — |
| T. Rowe Price (TRRJX) | 16.1% | 15.36% | 7.68% | +1.69 pp | +2.33 pp | $13M | $29M |

26

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| Fidelity (FFTHX) | 19.16% | 15.9% | 7.95% | +2.23 pp | +2.6 pp | $17M | $32M |
| Vanguard (VTTHX) | 17.54% | 15.46% | 7.71% | +1.79 pp | +2.36 pp | $13M | $29M |
| Am. Funds (RFFTX) | 17.17% | 15.58% | 8.36% | +1.91 pp | +3.01 pp | $14M | $38M |
| BlackRock LifePath | 16.01% | 14.38% | 7.26% | +0.71 pp | +1.91 pp | $5.3M | $23.9M |

96.    The 2035 Retirement Fund has materially and consistently underperformed its benchmark and all five comparator funds over both the three-year and five-year trailing periods.

97.    The Fund returned 13.67% on a three-year basis and 5.35% on a five-year basis, underperforming its own benchmark by 94 and 199 basis points respectively. The comparator funds—T. Rowe Price Retirement 2035 (TRRJX), Fidelity Freedom 2035 (FFTHX), Vanguard Target Retirement 2035 (VTTHX), American Funds 2035 Target Date Retirement R6 (RFFTX), and BlackRock LifePath Index 2035—outperformed the Fund by between 71 and 223 basis points on a three-year basis and between 191 and 301 basis points on a five-year basis.

98.    The five-year underperformance is particularly striking: had $250 million been invested in comparator funds rather than the 2035 Fund, participants would have realized between approximately $24 million and $38 million in additional returns, representing meaningful retirement savings that were lost to imprudent fund selection.

**Table 5: Amex TDF 2040 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|------|------|------|------|------|------|------|------|
| The 2040 Retirement Fund (Amex) | 16.87% | 14.83% | 5.89% | — | — | — | — |
| T. Rowe Price (TRRDX) | 17.46% | 16.68% | 8.44% | +1.85 pp | +2.55 pp | $14M | $32M |
| Fidelity (FFFFX) | 22% | 18.37% | 9.56% | +3.54 pp | +3.67 pp | $27M | $46M |
| Vanguard (VFORX) | 18.76% | 16.63% | 8.57% | +1.8 pp | +2.68 pp | $14M | $34M |
| Am. Funds (RFGTX) | 19.5% | 17.85% | 9.54% | +3.02 pp | +3.65 pp | $23M | $46M |
| BlackRock LifePath | 17.63% | 16.17% | 8.49% | +1.34 pp | +2.60 pp | $10M | $32.5M |

99.    The 2040 Retirement Fund has materially and consistently underperformed its benchmark and all five comparator funds, with the performance gap widening materially over longer time horizons.

100.    The Fund returned 14.83% on a three-year basis and 5.89% on a five-year basis, lagging its own benchmark by 106 and 222 basis points respectively.

101.    The comparator funds—T. Rowe Price Retirement 2040 (TRRDX), Fidelity Freedom 2040 (FFFFX), Vanguard Target Retirement 2040 (VFORX), American Funds 2040 Target Date Retirement R6 (RFGTX), and BlackRock LifePath Index 2040—outperformed the Fund by between 134 and 354 basis points over three years and between 255 and 367 basis points over five years. A $250 million investment in comparator funds would have generated between approximately $10 million and $27 million more in returns over three years, and between approximately $32 million and $46 million more in returns over five years — making the 2040 Fund among the most damaging allocations in the Series.

**Table 6: Amex TDF 2045 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| The 2045 Retirement Fund (Amex) | 17.38% | 15.4% | 6.32% | — | — | — | — |
| T. Rowe Price (TRRKX) | 18.51% | 17.6% | 9.05% | +2.2pp | +2.73 pp | $17M | $34M |
| Fidelity (FFFGX) | 23.77% | 19.36% | 10.11% | +3.96 pp | +3.79 pp | $30M | $47M |
| Vanguard (VTIVX) | 19.99% | 17.76% | 9.41% | +2.36 pp | +3.09 pp | $18M | $39M |
| Am. Funds (RFHTX) | 20.42% | 18.56% | 9.82% | +3.16 pp | +3.5 pp | $24M | $44M |
| BlackRock LifePath | 19.24% | 17.87% | 9.62% | +2.47pp | +3.30pp | $18.5M | $41.3M |

102. The 2045 Retirement Fund has materially and consistently underperformed its benchmark and all five comparator funds across every relevant time period.

103. The Fund returned 15.4% on a three-year basis and 6.32% on a five-year basis, trailing its own fiduciary-selected benchmark by 119 and 244 basis points respectively. Against the comparators—T. Rowe Price Retirement 2045 (TRRKX), Fidelity Freedom 2045 (FFFGX), Vanguard Target Retirement 2045 (VTIVX), American Funds 2045 Target Date Retirement R6 (RFHTX), and BlackRock LifePath Index 2045—the Fund lagged by between 220 and 396 basis points over three years and between 273 and 379 basis points over five years.

104. A $250 million investment in the comparator funds would have returned between approximately $17 million and $30 million more in returns over three years, and between approximately $34 million and $47 million more in returns over five years, representing a substantial loss to participants who are still decades from retirement and thus most acutely harmed by compounding shortfalls.

29

**Table 7: Amex TDF 2050 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| The 2050 Retirement Fund (Amex) | 17.89% | 15.97% | 6.63% | — | — | — | — |
| T. Rowe Price (TRRMX) | 18.81% | 17.89% | 9.22% | +1.92 pp | +2.59 pp | $14M | $32M |
| Fidelity (FFFHX) | 23.72% | 19.37% | 10.12% | +3.4 pp | +3.49 pp | $25M | $44M |
| Vanguard (VFIFX) | 21.41% | 18.70% | 9.95% | +2.73 pp | +3.32 pp | $20M | $41M |
| Am. Funds (RFITX) | 20.43% | 18.87% | 9.82% | +2.9 pp | +3.19 pp | $22M | $40M |
| BlackRock LifePath | 20.90% | 19.22% | 10.47% | +3.25pp | +3.84pp | $24.4M | $48.0M |

105.    The 2050 Retirement Fund has materially and consistently trailed its benchmark and all five comparator funds over both the three-year and five-year periods.

106.    The Fund returned 15.97% and 6.63% on three-year and five-year bases respectively, underperforming its own benchmark by 125 and 262 basis points.

107.    The comparators—T. Rowe Price Retirement 2050 (TRRMX), Fidelity Freedom 2050 (FFFHX), Vanguard Target Retirement 2050 (VFIFX), American Funds 2050 Target Date Retirement R6 (RFITX), and BlackRock LifePath Index 2050—outperformed the Fund by between 192 and 340 basis points over three years and between 259 and 384 basis points over five years.

108.    Had the Plan's estimated $250 million allocation been placed in any of the comparator funds, participants would have earned between approximately $14 million and $25 million more in returns over three years, and between approximately $32 million and $48 million more in returns over five years.

30

**Table 8: Amex TDF 2055 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| **The 2055 Retirement Fund (Amex)** | 18.4% | 16.43% | 6.87% | — | — | — | — |
| T. Rowe Price (TRRNX) | 18.94% | 17.96% | 9.23% | +1.53pp | +2.36 pp | $11M | $29M |
| Fidelity (FDEEX) | 23.73% | 19.37% | 10.11% | +2.94pp | +3.24 pp | $22M | $41M |
| Vanguard (VFFVX) | 21.43% | 18.71% | 9.96% | +2.28 pp | +3.09 pp | $17M | $39M |
| Am. Funds (RFKTX) | 20.74% | 19.21% | 9.85% | +2.78 pp | +2.98 pp | $21M | $37M |
| BlackRock LifePath | 21.73% | 19.82% | 10.82% | +3.39pp | +3.95pp | $25.4M | $49.3M |

109.    The 2055 Retirement Fund has materially and consistently underperformed its benchmark and all five comparator funds over the three and five-year trailing period, with the underperformance accelerating over longer time horizons.

110.    The Fund returned 16.43% on a three-year basis and 6.87% on a five-year basis, trailing its own benchmark by 136 and 273 basis points respectively.

111.    The comparators—T. Rowe Price Retirement 2055 (TRRNX), Fidelity Freedom 2055 (FDEEX), Vanguard Target Retirement 2055 (VFFVX), American Funds 2055 Target Date Retirement R6 (RFKTX), and BlackRock LifePath Index 2055—outperformed the Fund by between 153 and 339 basis points over three years and between 236 and 395 basis points over five years. A $250 million investment in comparator funds would have generated between approximately $11 million and $25 million more in returns over three years, and between approximately $29 million and $49 million more in returns over five years.

31

**Table 9: Amex TDF 2060 vs. Comparators**

| Fund | 1-Yr | 3-Yr | 5-Yr | 3-Yr Gap vs. Amex | 5-Yr Gap vs. Amex | Damage (3-Yr, $250M) | Damage (5-Yr, $250M) |
|---|---|---|---|---|---|---|---|
| The 2060 Retirement Fund (Amex) | 18.4% | 16.44% | 6.87% | — | — | — | — |
| T. Rowe Price (TRRLX) | 18.97% | 17.97% | 9.24% | +1.53 pp | +2.37 pp | $11M | $30M |
| Fidelity (FDKQX) | 23.13% | 18.61% | 9.58% | +2.17 pp | +2.71 pp | $16M | $34M |
| Vanguard (VTTSX) | 21.42% | 18.71% | 9.96% | +2.27 pp | +3.09 pp | $17M | $39M |
| Am. Funds (RFUTX) | 20.77% | 19.3% | 9.84% | +2.86 pp | +2.97 pp | $21M | $37M |
| BlackRock LifePath | 21.87% | 19.88% | 10.84% | +3.44pp | +3.97pp | $25.8M | $49.7M |

112.    The 2060 Retirement Fund, designed for the Plan's youngest participants with the longest investment horizons and therefore the greatest sensitivity to compounding, has underperformed its benchmark and all five comparator funds across every measured period.

113.    The Fund returned 16.44% on a three-year basis and 6.87% on a five-year basis, trailing its own benchmark by 135 and 273 basis points respectively. Against the comparators—T. Rowe Price Retirement 2060 (TRRLX), Fidelity Freedom 2060 (FDKQX), Vanguard Target Retirement 2060 (VTTSX), American Funds 2060 Target Date Retirement R6 (RFUTX), and BlackRock LifePath Index 2060—the Fund lagged by between 153 and 344 basis points over three years and between 237 and 397 basis points over five years.

114.    A $250 million investment in comparator funds rather than the 2060 Fund would have produced between approximately $11 million and $26 million more over three years, and between approximately $30 million and $50 million more over five years. Given that the participants invested in this vintage are typically furthest from retirement, the long-run cost of this underperformance—compounded over decades—is expected to be far greater than these near-term estimates reflect.

115.    The Challenged Funds are estimated to hold approximately $2 billion in total assets, the substantial majority of which is allocated to the Retirement Fund Series as the Plan's Qualified Default Investment Alternative. Assuming, conservatively, that $2 billion is distributed equally across the eight vintages of the Series—approximately $250 million per vintage—the aggregate damages to Plan participants across the full Series are estimated to be between approximately **$99 million and $174 million** on a trailing three-year basis, and between approximately **$226 million and $312 million** on a trailing five-year basis, depending on which comparator fund is used as the benchmark for the lost-opportunity calculation.

116.    These figures represent the additional value that $2 billion invested in the comparator funds would have generated for Plan participants over the relevant periods, compounded at each fund's annualized rate of return. They are conservative in two respects: first, they use a conservative allocation estimate of $2 billion, which may understate the Series' actual share of Plan assets; and second, they do not account for the further compounding losses that will accrue to the Plan's youngest participants—those invested in the 2050, 2055, and 2060 vintages—whose retirement horizons extend decades beyond the five-year measurement window used here.

117.    If the Amex fiduciaries had followed a prudent process, they should have long ago discovered that their TDF funds consistently underperformed both benchmarks—which is a severe red flag demonstrating that the managers of the fund are failing their essential purpose of outperforming their own chosen market index that they compete against. Thus, the TDF did not justify its risk over risk free index benchmarks—violating one of the most basic investment principles.

118.    Further, if the Amex fiduciaries examined any of the largest TDFs they would have discovered that the underperformance did not stop at the index benchmarks and that 4 of the largest

TDFs all also dramatically outperformed their selection. Each of these TDFs was readily available to the Plan and would have dramatically improved its performance.

119.    Inaction under these circumstances then prevailing is inexplicable absent a breakdown of prudent process.

## B.  Challenged Fund—The U.S. Large-Cap Equity Fund

120.    The Large-Cap Fund is a custom investment fund managed exclusively for the Plan, which has been offered as an investment option since at least 2006.

121.    The Large-Cap Fund is explicitly benchmarked against the S&P 500 TR Index and is categorized in the Large Growth Morningstar category.

122.    Its stated investment objective is to provide long-term capital appreciation by investing in large-capitalization U.S. equities, and its fund materials expressly state the goal of *outperforming* the S&P 500 Index over a full market cycle. Plaintiffs conservatively estimate that the Plan invested approximately $250 million in the Large-Cap Fund during the Class Period. The Large-Cap Fund is a "fund of funds" investing in five underlying equity funds. As of December 31, 2025, none of the Fund's assets were invested in Bonds, with only 0.7% in Cash, and all remaining assets in equities and "other" assets—with approximately 70% of those in Large-Cap equities.

123.    The Large-Cap Fund's persistent failure to deliver on its stated objective is the most egregious example of Defendants' fiduciary failures. Throughout the Class Period, the Large-Cap Fund failed to beat the S&P 500 benchmark in any year of the Class Period, and trailed the peer median five-year return in the substantial majority of measurement periods.

34

124. The following exhibit sets forth the annualized total returns for the Large-Cap Fund against its benchmark for the one-year, three-year, five-year, and ten-year periods ending December 31, 2025.

**Table 10: Large-Cap Fund vs. Benchmark**

| Fund | 1-Year | 3-Year | 5-Year | 10-Year | Exp. Ratio |
|---|---|---|---|---|---|
| The U.S. Large-Cap Equity Fund (Amex) | 17.67% | 21.58% | 10.35% | 13.05% | 0.27% |
| S&P 500 Index TR | 17.88% | 23.01% | 14.42% | 14.82% | — |
| Gap (Amex vs. Benchmark) | -.21 pp | -1.43 pp | -4.07pp | -1.77 pp | — |

125. The table shows that the Large-Cap Fund trailed its own benchmark by 21 basis points over one year, 143 basis points over three years, and 407 basis points over five years. Notably, the S&P 500 is not an independently imposed external standard—it is the benchmark selected by the Plan's own fiduciaries. The Fund's failure to meet the standard its own fiduciaries set for it violates a basic investment concept of justifying additional cost and active management by an expectation of additional returns. Across every measured time period, this fund fails this core investment principles and is itself direct evidence of imprudence.

126. The Large-Cap Fund's underperformance is even more pronounced when measured against a peer group of four actively managed large-cap growth funds selected based on the same Morningstar category (Large Growth), comparable investment strategy, and institutional availability.

127. All the peer funds are actively managed mutual funds in the Large Growth Morningstar category. Each of the peer funds has approximately ninety percent or more of its assets in equities with a similar exposure to U.S. markets. The peer funds follow a similar strategy as Amex with a focus on large cap U.S. equities. Given the similarity in style, asset allocation, and

strategy the peer funds and are meaningful benchmarks to measure Amex's consistent underperformance.

**Table 11: Large-Cap Fund vs. Comparable Peers**

| Fund | 1-Yr | 3-Yr | 5-Yr | 10-Yr | 3-Yr Gap | 5-Yr Gap | 5-Yr Damage ($250M) |
|---|---|---|---|---|---|---|---|
| The U.S. Large-Cap Equity Fund (Amex) | 17.67% | 21.58% | 10.35% | 13.05% | — | — | — |
| Fidelity (FGCKX) | 24.42% | 36.03% | 15.4% | 20.77% | +14.45 pp | +5.05 pp | $63.1M |
| T. Rowe (PRWAX) | 16.33% | 23.4% | 12.31% | 17.04% | +1.82 pp | +1.96 pp | $24.5M |
| Loomis (LSGRX) | 15.79% | 33.66% | 15.75% | 17.8% | +12.08 pp | +5.4 pp | $67.5M |
| Nuveen (TILGX) | 15.59% | 29.97% | 11.51% | 15.8% | +8.39 pp | +1.16 pp | $14.5M |

128.    As of December 31, 2025, the Large-Cap Fund returned 21.58% on a three-year annualized basis and 10.35% on a five-year annualized basis. By contrast, the four comparators— the Fidelity Growth Company K6 Fund (FGCKX), the T. Rowe Price All-Cap Opportunities Fund (PRWAX), the Loomis Sayles Growth Y Fund (LSGRX), and the Nuveen Large Cap Growth R6 Fund (TILGX)— returned between 23.40% and 36.03% on a three-year basis and between 11.51% and 15.75% on a five-year basis. The Fund lagged the comparator average by approximately 27.5% on an annualized three-year basis and 16.96% on an annualized five-year basis. Had the Plan's estimated $250 million allocation to the Large-Cap Equity Fund instead been invested in any of the four comparators, participants would have realized between approximately $14.5 million and $67.5 million in additional returns over the five-year period. The average five-year damage across all four comparators is approximately $42 million.

129.    **Fidelity Growth Company K6 Fund (FGCKX)** has similar aims, risks, and potential rewards to those of the Large-Cap Fund. Like the Large-Cap Fund, the FGCKX is an

actively managed large cap growth fund. FGCKX's aim is to seek capital appreciation. Like the Large-Cap Fund, the FGCKX pursues its aim by investing primarily in common stocks of large-sized companies with growth characteristics. Approximately 95% of FGCKX's portfolio is invested in equities, with 78% in Large Cap equities, and 97% of its assets are in the United States. By investing a significant portion of its assets in stocks, including growth-oriented stocks, FGCKX, like the Large-Cap Fund, is considered to have a very aggressive risk profile. The aims, risks, and potential rewards of FGCKX are similar to those of the Large-Cap Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their very aggressive risk profiles. These facts make FGCKX a meaningful comparator to the Large-Cap Fund.

130.    **T. Rowe Price All-Cap Opportunities Fund (PRWAX)** has similar aims, risks, and potential rewards to those of the Large-Cap Fund. Like the Large-Cap Fund, PRWAX is an actively managed large cap growth fund. PRWAX's aim is to seek long-term capital growth. Like the Large-Cap Fund, PRWAX pursues its aim by investing primarily in common stocks of growth companies, with a focus on U.S. companies operating in the fastest-growing sectors of the economy. Approximately 95% of PRWAX's portfolio is invested in equities, with 78% in Large Cap equities, and 93% of its assets are in the United States. By investing a significant portion of its assets in stocks, including growth-oriented stocks, PRWAX, like the Large-Cap Fund, is considered to have a very aggressive risk profile. The aims, risks, and potential rewards of PRWAX are similar to those of the Large-Cap Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their very aggressive risk profiles. These facts make PRWAX a meaningful comparator to the Large-Cap Fund.

37

131.    **Loomis Sayles Growth Y (LSGRX)** has similar aims, risks, and potential rewards to those of the Large-Cap Fund. Like the Large-Cap Fund, LSGRX is an actively managed large cap growth fund. LSGRX's aim is to seek long-term growth of capital. Like the Large-Cap Fund, LSGRX pursues its aim by investing primarily in equity securities, including common stocks, with a focus on stocks of large capitalization companies. Approximately 99% of LSGRX's portfolio is invested in equities, with 91% in Large Cap equities, and 93% of its assets are in the United States. By investing a significant portion of its assets in stocks, including growth-oriented stocks, LSGRX, like the Large-Cap Fund, is considered to have a very aggressive risk profile. The aims, risks, and potential rewards of LSGRX are similar to those of the Large-Cap Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their very aggressive risk profiles. These facts make LSGRX a meaningful comparator to the Large-Cap Fund.

132.    **Nuveen Large Cap Growth R6 (TILGX)** has similar aims, risks, and potential rewards to those of the Large-Cap Fund. Like the Large-Cap Fund, TILGX is an actively managed large cap growth fund. The Nuveen Fund's aim is to seek a favorable long-term return, mainly through capital appreciation. Like the Large-Cap Fund, TILGX pursues its aim by investing primarily in equity securities of large-capitalization growth companies, with at least 80% of its net assets invested in such securities. Approximately 99% of TILGX's portfolio is invested in equities, with 90% in Large Cap equities, and 100% of its assets are in the United States. By investing a significant portion of its assets in stocks, including growth-oriented stocks, TILGX, like the Large-Cap Fund, is considered to have a very aggressive risk profile. The aims, risks, and potential rewards of TILGX are similar to those of the Large-Cap Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their very

38

aggressive risk profiles. These facts make TILGX a meaningful comparator to the Large-Cap Fund.

133.    Amex amended the Large-Cap Fund's investment manager lineup in 2023, transitioning to Atlanta Capital Management Company, Brandywine Global Investment Management, Fidelity Institutional Asset Management, The London Company of Virginia, and Vanguard Fiduciary Trust Company.

134.    This change—coming after a decade of consecutive years of documented underperformance—does not diminish Defendants' liability for the losses incurred throughout the Class Period. A prudent fiduciary would have taken remedial action years earlier.

135.    The belated manager change, if anything, confirms that Defendants acknowledged the fund's deficiencies but failed to act in a timely manner.

136.    Had the Plan's estimated $250 million allocation been invested in the comparator funds rather than the Large-Cap Fund, participants would have earned between approximately $14.5 million and $67.5 million more over five years, with an average five-year damage across all four comparators of approximately $42.4 million.

## C.  Challenged Fund–The International Equity Fund ("IEF")

137.    The IEF has been offered as an investment option in the Plan since at least 2006.

138.    The IEF is benchmarked against the MSCI All Country World ex-US Investable Market Index (Net Return) and invests predominantly in stocks across developed and emerging non-U.S. equity markets through a multi-manager structure. Plaintiffs conservatively estimate that the Plan invested approximately $250 million in IEF during the Class Period.

139.    Throughout the Class Period, the IEF persistently underperformed both its prospectus benchmark and a peer group of four similarly situated international equity funds on a

39

trailing three-year basis for at least six consecutive years. As illustrated in the tables below, the IEF's underperformance relative to its peer group was substantial across all measurement periods.

140.   The following exhibit sets forth the annualized total returns for the IEF against its benchmark for the one-year, three-year, five-year, and ten-year periods ending December 31, 2025.

**Table 12: IEF vs. Benchmark**

| Fund | 1-Year | 3-Year | 5-Year | 10-Year | Exp. Ratio |
|---|---|---|---|---|---|
| The International Equity Fund (Amex) | 27.44% | 15.49% | 5.53% | 8.13% | 0.46% |
| MSCI ACWI ex-US IMI NR | 31.96% | 17.1% | 7.77% | 8.37% | — |
| Gap (Amex vs. Benchmark) | -4.52 pp | -1.61 pp | -2.24 pp | -0.24 pp | — |

141.   As shown above, the IEF trailed its benchmark on the three-year measure by 161 basis points, it trailed on both the one-year (by 452 basis points) and five-year (by 224 basis points) horizons. The ten-year gap is also negative, with the IEF returning 8.13% against the benchmark's 8.37%. This fund, like the other Challenged Funds, violates the basic investment principle of CAPM that additional costs need to be accompanied by an expectation of additional rewards. This pattern of underperformance is precisely the kind of inconsistent performance that a prudent fiduciary should have identified as cause for heightened scrutiny. Critically, as described further below, the IEF's underperformance during much of the Class Period is directly attributable to the retention of Morgan Stanley Investment Management as a primary manager, a retention that cannot be explained by performance considerations alone.

142.   When measured against a peer group of four similarly situated actively managed international equity funds—the MFS International Equity I Fund (MIEKX), the Artisan International Value Institutional Fund (APHKX), the Hartford Schroders International R5 Stock

Fund, and the BlackRock Advantage International Institutional Fund (BROIX)—the IEF's underperformance is systematic and material across the three-year and five-year periods.

143. All four peer funds, like the IEF, are actively managed mutual funds in the Foreign Large Blend Morningstar category. Each of the peer funds has approximately ninety percent of its assets in equities and over eighty percent of assets in foreign and emerging markets. The peer funds follow a strategy similar to the IEF's own mandate of providing long-term capital appreciation through diversified non-U.S. equity investments. Given the similarity in Morningstar category, geographic exposure, investment strategy, and portfolio composition, the peer funds are meaningful benchmarks to measure the IEF's consistent underperformance.

**Table 13: IEF vs. Comparable Peers**

| Fund | 1-Yr | 3-Yr | 5-Yr | 10-Yr | 3-Yr Gap | 5-Yr Gap | 5-Yr Damage ($250M) |
|---|---|---|---|---|---|---|---|
| The International Equity Fund (IEF / Amex) | 27.44% | 15.49% | 5.53% | 8.13% | — | — | — |
| MFS (MIEKX) | 23.13% | 15.07% | 8.36% | 9.35% | -0.42 pp | +2.83 pp | $35.4M |
| Artisan (APHKX) | 22.8% | 17.21% | 11.91% | 10.16% | +1.72 pp | +6.38 pp | $79.8M |
| Hartford Schroders Int. Stock Fund R5 (HSWTX) | 26.03% | 16.56% | 7.45% | 11.85% | +1.07 pp | +1.92 pp | $24.0M |
| BlackRock (BROIX) | 32.41% | 19.08% | 10.44% | 8.91% | +3.59 pp | +4.91 pp | $61.4M |

144. As of December 31, 2025, IEF returned 15.49% on a three-year annualized basis and 5.53% on a five-year annualized basis. By contrast, the four comparators—MFS International Equity (MIEKX), the Artisan International Value Instl. (APHKX), the Hartford Schroders International Stock Fund R5 (HSWTX), and the BlackRock Advantage International Instl. (BROIX)—returned between 15.07% and 19.08% on a three-year basis and between 7.45% and

11.91% on a five-year basis. IEF lagged the comparator average by approximately 4.47% on an annualized three-year basis and 20.05% on an annualized five-year basis.

145.    **MFS International Equity I (MIEKX)** has similar aims, risks, and potential rewards to those of IEF. Like IEF, MIEKX is an actively managed international equity fund. The MFS Fund's aim is to seek capital appreciation. Like IEF, MIEKX pursues its aim by investing primarily in foreign equity securities, including emerging market securities, with at least 80% of its net assets invested in such securities. Approximately 98% of MIEKX's portfolio is invested in equities, with approximately 96% in Developed Ex U.S. markets and approximately 3% in Emerging Markets. MIEKX falls within the Foreign Large Blend Morningstar category. By investing substantially all of its assets in foreign stocks across developed and emerging markets, MIEKX, like IEF, would be considered to have an aggressive risk profile. The aims, risks, and potential rewards of MIEKX are similar to those of IEF given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their comparable risk profiles. These facts make MIEKX a meaningful comparator to IEF.

146.    **Artisan International Value Instl. (APHKX)** has similar aims, risks, and potential rewards to those of IEF. Like IEF, APHKX is an actively managed international equity fund. The Artisan Fund's aim is to seek long-term capital growth. Like IEF, APHKX pursues its aim by investing primarily in foreign equity securities, including emerging market securities, with at least 80% of its net assets invested in such securities. Approximately 83% of APHKX's portfolio is invested in equities, with approximately 84% in Developed Ex U.S. markets and approximately 4% in Emerging Markets. APHKX falls within the Foreign Large Blend Morningstar category. By investing substantially all of its assets in foreign stocks across developed and emerging markets, APHKX, like IEF, would be considered to have an aggressive risk profile. The aims, risks, and

potential rewards of APHKX are similar to those of IEF given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their comparable risk profiles. These facts make APHKX a meaningful comparator to IEF.

147. **Hartford Schroders International Stk R5 (HSWTX)** has similar aims, risks, and potential rewards to those of IEF. Like IEF, HSWTX is an actively managed international equity fund. The Hartford Schroders Fund's aim is to seek long-term capital appreciation through investment in securities markets outside the United States. Like IEF, HSWTX pursues its aim by investing primarily in foreign equity securities, including emerging market securities, with at least 65% of its total assets invested in equity securities of companies located outside the United States. Approximately 99% of HSWTX's portfolio is invested in equities, with approximately 85% in Developed Ex U.S. markets and approximately 11% in Emerging Markets. HSWTX falls within the Foreign Large Blend Morningstar category. By investing substantially all of its assets in foreign stocks across developed and emerging markets, HSWTX, like IEF, would be considered to have an aggressive risk profile. The aims, risks, and potential rewards of HSWTX are similar to those of IEF given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their comparable risk profiles. These facts make HSWTX a meaningful comparator to IEF.

148. **BlackRock Advantage International Instl. (BROIX)** has similar aims, risks, and potential rewards to those of IEF. Like IEF, BROIX is an actively managed international equity fund. The BlackRock Fund's aim is to seek long-term capital appreciation. Like IEF, BROIX pursues its aim by investing primarily in non-U.S. equity securities, with at least 80% of its net assets invested in such securities. Approximately 98% of BROIX's portfolio is invested in equities, with approximately 99% in Developed Ex U.S. markets and approximately 0.2% in Emerging

Markets. BROIX falls within the Foreign Large Blend Morningstar category. By investing substantially all of its assets in foreign stocks across developed markets, BROIX, like IEF, would be considered to have an aggressive risk profile. The aims, risks, and potential rewards of BROIX are similar to those of IEF given the similarities in the two funds' investment strategies, the types of stocks the two funds are invested in, and their comparable risk profiles. These facts make BROIX a meaningful comparator to IEF.

149. Had the Plan's estimated $250 million allocation been invested in the comparator funds rather than the IEF, participants would have earned between approximately $24 million and $79.8 million more over five years, with an average five-year damage across all four comparators of approximately $50 million.

## D. The Morgan Stanley Conflict of Interest and Its Systemic Impact on the Plan

150. The persistent underperformance of the IEF, described in Section V.D above, is not adequately explained by market conditions, investment strategy, or any factor exogenous to the fiduciary process. One of the IEF's primary active investment managers throughout much of the Class Period was Morgan Stanley Investment Management, Inc. ("MSIM"), a wholly-owned subsidiary of Morgan Stanley & Co. LLC ("Morgan Stanley"). Morgan Stanley was not an arm's-length party to the Plan. To the contrary, Morgan Stanley maintained a deep, multi-faceted, and ongoing commercial relationship with American Express that created a substantial conflict of interest for the Investment Committee in selecting and retaining MSIM as an IEF manager—and Amex's own regulatory filings acknowledge it.

151. Throughout the Class Period, American Express and Morgan Stanley maintained a substantial and mutually lucrative business relationship across multiple commercial dimensions.

152.    First, American Express and Morgan Stanley have operated a co-branded credit card partnership since at least 2012, when they jointly launched the American Express Platinum Card exclusively for Morgan Stanley Smith Barney clients. This partnership was renewed and expanded as recently as December 2023, when the parties announced a new co-branded cash back credit card—demonstrating that the commercial relationship was active and ongoing throughout the entirety of the Class Period.

153.    Second, Morgan Stanley has served as a Joint Book-Running Manager for American Express Company's debt note offerings, as disclosed in SEC filings. In a March 2022 offering of $4,000,000,000 in senior unsecured notes by American Express, Morgan Stanley & Co. LLC is listed alongside Barclays Capital, Citigroup, and Deutsche Bank as one of four Joint Book-Running Managers. In this capacity, Morgan Stanley directly facilitated Amex's ability to access capital markets, creating a financial relationship in which Amex had a material economic interest in maintaining Morgan Stanley's goodwill.

154.    Third—and critically—Amex's own Form 11-K filed with the Securities and Exchange Commission for the American Express Retirement Savings Plan expressly identifies Morgan Stanley as a "party-in-interest" to the Plan within the meaning of ERISA Section 3(14), 29 U.S.C. § 1002(14). This designation is not a technicality. Under ERISA, a party-in-interest relationship triggers heightened scrutiny and specific prohibitions on certain transactions. Amex's own disclosure of this relationship put its fiduciaries on notice that any decision to invest Plan assets with a Morgan Stanley affiliate—including retaining MSIM as an IEF investment manager—required extraordinary care and a documented, loyalty-driven rationale to ensure that these decisions were made for the sole benefit of the plan participants and beneficiaries.

155.    Fourth, at least one member of Amex's Board of Directors who served on the Compensation and Benefits Risk Committee—the committee responsible for oversight of Plan governance—has deep personal ties to Morgan Stanley. Specifically, Charles E. Phillips, who has served as an Amex director since 2020, is identified in Amex's own public filings as a former Managing Director of Morgan Stanley and currently serves on the Compensation and Benefits Risk Committee. Phillips's connection to Morgan Stanley extends beyond his prior employment: in June 2006, Phillips was appointed to Morgan Stanley's Board of Directors, where he served as an elected independent director, as confirmed by Morgan Stanley's proxy statement filed with the Securities and Exchange Commission in 2010.

156.    The presence of a former senior Morgan Stanley executive on the committee overseeing the very Plan in which MSIM was retained as a manager creates a structural conflict of interest that a loyal fiduciary was obligated to identify, document, and manage to ensure that the scrupulous standards of care set forth in ERISA were, at all times, maintained.

157.    Notwithstanding these relationships, and in the face of the IEF's persistent, documented underperformance during the Class Period, the Investment Committee retained MSIM as a primary investment manager of the IEF for years. According to the IEF fund fact sheet dated September 30, 2024, the IEF's investment managers included Morgan Stanley Investment Management, Inc. alongside Capital Research and Management Company, Dimensional Fund Advisors, Inc., BlackRock, and Neuberger Berman Trust Company N.A. The IEF returned 2.33% on a three-year annualized basis and 7.28% on a five-year annualized basis as of September 30, 2024—trailing its benchmark and every one of the four comparator funds identified in Section V.D above across every relevant period. The IEF's category average return, as reported by Morningstar, was 4.29% on a three-year basis and 7.73% on a five-year basis as of that same

date—meaning the IEF underperformed even the median fund in its own peer category. A prudent, loyal fiduciary who had identified MSIM's contribution to this underperformance and recognized the pervasive conflicts described above would have replaced MSIM promptly. The Investment Committee did not do so.

158. Amex eventually transitioned the International Equity Fund by replacing certain of its managers, including MSIM, with alternative strategies—including the Capital Group EuroPacific Growth Trust—in approximately July 2023. This replacement is itself an implicit acknowledgment that the prior manager lineup was inadequate. But this correction came years after the underperformance was apparent and documentable. A fiduciary monitoring the IEF's performance with the rigor that ERISA demands would have identified the need for change far earlier. The belated transition does not cure the harm already done to participants during the Class Period, and it does not retroactively justify the years during which MSIM was retained despite both its documented underperformance and the Investment Committee's obvious and unmanaged conflict of interest.

159. The Morgan Stanley conflict of interest is not confined to the IEF alone. Because the Amex Retirement Fund Series is structured as a custom funds-of-funds—with each TDF vintage investing directly in the IEF as one of its four core underlying funds—the IEF's underperformance attributable to MSIM was transmitted into every vintage of the TDF Series, contaminating the retirement savings of every participant whose account was invested in the Plan's QDIA.

160. The degree of contamination varies by vintage in direct proportion to each fund's allocation to the IEF. Younger participants invested in vintages further from retirement carry a substantially higher IEF allocation, as international equity exposure is weighted more heavily in

growth-oriented portfolios. Specifically, as of January 1, 2025, the IEF accounted for approximately 18% of the 2025 Fund's portfolio, 22% of the 2030 Fund, 26% of the 2035 Fund, 30% of the 2040 Fund, 32% of the 2045 Fund, 34% of the 2050 Fund, and 36% of both the 2055 and 2060 Funds. The IEF underperformed its peer comparators by approximately 413 basis points per year on a five-year annualized basis and 304 basis points per year on a three-year annualized basis. Applying those underperformance figures to each vintage's IEF weighting produces an estimated annual performance drag of between 74 and 149 basis points per vintage attributable solely to the IEF's underperformance—with younger participants in the 2055 and 2060 Funds bearing the heaviest drag.

161. Across the full $2 billion estimated in the TDF Series, the IEF's underperformance—traceable in significant part to the Investment Committee's conflicted and imprudent retention of MSIM—imposed a substantial additional drag on the TDF portfolio, compounding the direct losses suffered by the estimated $250 million invested directly in the IEF itself. These figures represent the portion of the TDF series' underperformance that can be attributed to the infected underlying fund—not the total TDF underperformance, which is addressed separately above.

162. The retention of MSIM as an IEF investment manager while Morgan Stanley simultaneously served as a co-brand credit card partner, as a Joint Book-Running Manager for Amex's debt offerings, as a designated party-in-interest to the Plan, and had a former senior executive serving on the committee overseeing Plan governance, is precisely the kind of conflicted fiduciary decision-making that ERISA Section 404(a)(1)(A)'s duty of loyalty was designed to prevent. Under ERISA, a fiduciary must act "solely in the interest" of participants and "for the exclusive purpose" of providing benefits. A decision to retain an underperforming investment

manager who is simultaneously a valued commercial partner of the plan sponsor cannot, by definition, have been made solely in the interest of participants. The self-dealing here was not subtle. Amex's own regulatory filings flagged Morgan Stanley as a party-in-interest. The Investment Committee proceeded to retain MSIM anyway—and continued to do so for years after the IEF's underperformance became undeniable. That decision was not prudent. It was not loyal. And the participants whose retirement savings were invested in the IEF and in every TDF vintage that relied on it bore the cost.

163.    A loyal fiduciary, unconstrained by the commercial relationships described above, would have identified MSIM's persistent underperformance and the structural conflict of interest at the outset of the Class Period, would have conducted a documented conflict-of-interest review, and would have replaced MSIM with a higher-performing manager—just as Amex eventually did, years too late, in 2023. The failure to do so earlier was a breach of both the duty of prudence under ERISA Section 404(a)(1)(B) and the duty of loyalty under ERISA Section 404(a)(1)(A), and resulted in losses to Plan participants that were entirely avoidable.

## CLASS ACTION ALLEGATIONS

164.    ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant or beneficiary of a plan to bring a civil action individually on behalf of the plan to enforce a fiduciary's liability to the plan under ERISA Section 409, 29 U.S.C. § 1109. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to a direct action on behalf of the Plan, Plaintiffs also seek to certify this action as a class action on behalf of Plan participants pursuant to Federal Rule of Civil Procedure 23.

165.    Plaintiffs seek to certify, and to be appointed representative of, the following Class:

All participants and beneficiaries of the American Express Retirement Savings Plan who had account balances invested in any of the Challenged Funds—the Retirement Fund Series (vintage 2025 through 2060), the U.S. Large-Cap Equity Fund, or the International Equity Fund—at any time from May 15, 2020 through the date of judgment (the "Class Period"), excluding Defendants, any of their directors, officers, or employees with responsibility for the Plan's investment or administrative functions, and their immediate family members.

166.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

167.    **Numerosity.** The Class includes tens of thousands of current and former Plan participants whose individual accounts were invested in one or more of the Challenged Funds during the Class Period. Joinder of all such members is impracticable. Fed. R. Civ. P. 23(a)(1).

168.    **Commonality.** There are questions of law and fact common to the Class, including: (a) whether Defendants breached their fiduciary duty of prudence by selecting and retaining the Challenged Funds; (b) whether Defendants breached their fiduciary duty of loyalty by retaining MSIM as manager of the IEF in light of the Morgan Stanley business relationship; (c) whether Defendants failed to monitor the Challenged Funds and the performance of other fiduciaries; (d) the appropriate measure of losses caused to the Plan by Defendants' breaches; and (e) the appropriate equitable and remedial relief. Fed. R. Civ. P. 23(a)(2).

169.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like each member of the Class, are current or former Plan participants whose retirement savings were invested in one or more of the Challenged Funds during the Class Period and who suffered losses as a result of Defendants' breaches of fiduciary duty. Plaintiffs' claims arise from the same course of Defendants' conduct and are based on the same legal theories applicable to the entire Class. Fed. R. Civ. P. 23(a)(3).

50

170.    **Adequacy.** Plaintiffs will adequately represent the interests of the Class. Plaintiffs participated in the Plan during the Class Period, had account balances invested in the Challenged Funds, have no interest that conflicts with the Class, and are committed to the vigorous prosecution of this action on behalf of all Class members. Plaintiffs have retained experienced and competent ERISA class action counsel at Milberg Coleman Bryson Phillips Grossman LLC, along with Chirinos Law Firm PLLC and Stiegler Law Firm LLC, who have the resources and expertise necessary to prosecute this action on behalf of the Class. Fed. R. Civ. P. 23(a)(4).

171.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual participants would create the risk of: (A) inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants with respect to their ERISA fiduciary duties; and (B) adjudications with respect to individual participants that would, as a practical matter, be dispositive of the interests of other participants not parties to those adjudications, or would substantially impair or impede those participants' ability to protect their interests. Fed. R. Civ. P. 23(b)(1).

172.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class—namely, their selection and retention of the Challenged Funds and their systemic failure to conduct adequate investment monitoring—so that final injunctive and declaratory relief reforming the Plan's investment menu is appropriate as to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

173.    **Predominance.** In the alternative, certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members. The central issues in this action—whether Defendants breached their fiduciary duties of prudence and loyalty by selecting and retaining the

Challenged Funds, whether they failed to monitor Plan investments and the performance of co-fiduciaries, and the appropriate measure of Plan-wide losses—will be resolved through evidence and legal arguments that apply uniformly to all Class members. The Court and the parties will spend the vast majority of their time resolving these common issues. Fed. R. Civ. P. 23(b)(3).

174. **Superiority.** A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty such that they will never bring suit individually. Further, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice. Fed. R. Civ. P. 23(b)(3).

175. **Manageability.** This case is well-suited for treatment as a class action and can easily be managed as such because evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis. Liability turns on Plan-wide fiduciary decisions that are common to all Class members. The allocation and distribution of any recovery to individual Class members' accounts would be essentially a ministerial function based on each participant's investment allocations and account balances during the Class Period—information already maintained in the Plan's recordkeeping system. Fed. R. Civ. P. 23(b)(3).

176. Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to: (a) whether Defendants breached their fiduciary duty of prudence by selecting and retaining the Challenged Funds; (b) whether Defendants breached their fiduciary duty of loyalty by retaining MSIM as manager of the IEF in light of the

52

Morgan Stanley business relationship; (c) whether Defendants failed to adequately monitor the Plan's investments and the performance of co-fiduciaries; and (d) whether Defendants caused the Plan to engage in a prohibited transaction with MSIM, a party-in-interest, in violation of ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C). Issue certification under Rule 23(c)(4) is appropriate because resolution of these common liability questions would materially advance the litigation and significantly narrow the issues remaining for individual adjudication, if any.

177.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Counsel have extensive experience in ERISA class action litigation, have the resources necessary to prosecute this action on behalf of the Class, and are committed to vigorously pursuing the claims alleged herein.

178.    Exhaustion of administrative remedies is not required, and would in any event be futile. Plaintiffs' claims are brought on behalf of the Plan for statutory violations of ERISA and breaches of fiduciary duty—not as a claim for individual benefits under the Plan's administrative procedures. The entity that would hear any administrative appeal (the Plan Administrator) is the same entity whose conduct is at issue in this litigation. Courts do not defer to plan administrator interpretations of legal obligations under ERISA's fiduciary duty provisions.

## CAUSES OF ACTION

### COUNT I

**Breach of Fiduciary Duty of Prudence**
**ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B)**
**Against The Investment Committee**

179.    Plaintiffs incorporate by reference paragraphs 1-178 as though fully set forth herein.

53

180.   At all relevant times, the Investment Committee was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and control over the management of the Plan and the disposition of its assets, including the selection, monitoring, and retention of the Plan's investment options.

181.   ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), required the Investment Committee to discharge its duties to the Plan with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

182.   The Investment Committee breached the duty of prudence by: (a) selecting and retaining the Challenged Funds as investment options despite their persistent, multi-year underperformance relative to their benchmarks and peer funds; (b) failing to conduct adequate ongoing monitoring of the Challenged Funds' performance; (c) failing to investigate the causes of the Challenged Funds' persistent underperformance; (d) failing to take timely corrective action, including promptly replacing the Challenged Funds with better-performing alternatives; and (e) retaining the Retirement Fund Series as the Plan's QDIA despite its persistent underperformance, thereby automatically directing the retirement savings of thousands of participants into a demonstrably inferior investment.

183.   A prudent fiduciary of a plan the size and sophistication of the American Express RSP, conducting the investment monitoring that ERISA demands, would have: identified the Challenged Funds' underperformance no later than 2021; recognized that three consecutive years of trailing three-year underperformance against both benchmarks and peer funds across all four Challenged Fund categories constituted compelling evidence of systematic investment management failure; investigated the causes of that underperformance; and replaced the

Challenged Funds with better-performing alternatives available in the marketplace. The Investment Committee failed to take any of these reasonably prudent steps.

184.    As a direct and proximate result of the Investment Committee's breach of the duty of prudence, the Plan and its participants and beneficiaries suffered losses of at least **hundreds of millions of dollars** in connection with the Large-Cap Fund and International Equity Fund, plus additional losses attributable to the TDF Series to be established through discovery and expert analysis.

185.    Pursuant to ERISA Sections 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Investment Committee is jointly and severally liable to restore to the Plan all losses resulting from their breaches of the duty of prudence, and are subject to such other equitable or remedial relief as the Court deems appropriate.


## COUNT II

**Breach of Fiduciary Duty of Loyalty**
**ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)**
**Against American Express Company and the Investment Committee**

186.    Plaintiffs incorporate by reference paragraphs 1-178 as though fully set forth herein.

187.    ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), required Defendants to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

188.    Defendants—and in particular American Express Company and the Investment Committee—breached the duty of loyalty by permitting Amex's significant and ongoing business relationship with Morgan Stanley to influence the selection and prolonged retention of Morgan

Stanley Investment Management, Inc. ("MSIM") as the primary active manager of the Plan's International Equity Fund.

189.     As alleged herein, at the time the Investment Committee retained and continued to retain MSIM as manager of the IEF: (a) Morgan Stanley was identified as a party-in-interest to the Plan in Amex's own Form 11-K filings; (b) American Express and Morgan Stanley maintained a valuable co-brand credit card partnership generating substantial commercial benefit to both companies; (c) Morgan Stanley served as a Joint Book-Running Manager for Amex's debt note offerings; and (d) at least one Amex director with Plan governance responsibilities had a direct personal connection to Morgan Stanley as a former Managing Director.

190.     A loyal fiduciary, acting solely in the interest of Plan participants and unconstrained by conflicting commercial interests, would have replaced MSIM as a manager of the IEF upon identifying its sustained underperformance. The Investment Committee's failure to do so— retaining an underperforming manager connected to Amex's largest financial services partner—is inconsistent with the conduct of a fiduciary acting for the "exclusive purpose" of providing benefits to Plan participants.

191.     As a direct and proximate result of Defendants' breach of the duty of loyalty, the Plan and its participants suffered losses attributable to the IEF's underperformance of at least $44,712,500, plus additional losses attributable to the TDF Series' exposure to the IEF to be established through discovery.

192.     Pursuant to ERISA Sections 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are jointly and severally liable to restore to the Plan all losses resulting from their breaches of the duty of loyalty, and are subject to such other equitable or remedial relief

56

as the Court deems appropriate, including disgorgement of any profits realized by reason of the fiduciary breaches.

## COUNT III

**Failure to Monitor Fiduciaries and Co-Fiduciary Liability**
**ERISA Sections 404(a) and 405(a), 29 U.S.C. §§ 1104(a) and 1105(a)**
**Against American Express Company and Defendant Yee**

193. Plaintiffs incorporate by reference paragraphs 1-178 as though fully set forth herein.

194. American Express Company, as Plan Sponsor and Tammy Yee, as Vice President, Global Well-Being and Benefits, are responsible for appointing, overseeing, and removing the members of the Investment Committee. By virtue of this appointment and supervisory authority, Amex and Defendant Yee had a fiduciary duty to monitor the performance of the Investment Committee and its members, and to take prompt and effective action to protect the Plan and its participants when the Investment Committee failed to fulfill their fiduciary obligations.

195. A monitoring fiduciary must ensure that appointed fiduciaries perform their fiduciary obligations, including those related to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan's participants when appointed fiduciaries fail to do so.

196. Amex and Defendant Yee breached their fiduciary monitoring duties by: (1) failing to monitor and evaluate the performance of the Investment Committee and its members on an ongoing basis; (2) failing to ensure that the Investment Committee had in place a sound process for identifying and replacing underperforming investment options; (3) failing to take action despite the Investment Committee's retention of the Challenged Funds across six consecutive years of documented underperformance; and (4) failing to remove Investment Committee members whose

performance was inadequate, as demonstrated by their continued maintenance of the Challenged Funds throughout the Class Period.

197.    In addition, pursuant to ERISA Section 405(a), 29 U.S.C. § 1105(a), each Defendant is liable as a co-fiduciary for the breaches of the other Defendants to the extent that: (1) such Defendant knowingly participated in, or knowingly undertook to conceal, an act or omission of another fiduciary knowing that such act or omission was a breach; (2) such Defendant, by its failure to comply with ERISA Section 404(a)(1) in the administration of its specific fiduciary responsibilities, enabled another fiduciary to commit a breach; or (3) such Defendant had knowledge of a breach by another fiduciary and failed to make reasonable efforts to remedy the breach.

198.    As a direct and proximate result of Amex's and the Defendant Yee's breach of their monitoring duties and each Defendant's co-fiduciary liability, the Plan and its participants suffered losses in the amounts described above. If Amex and Defendant Yee had fulfilled their monitoring obligations, the Investment Committee's fiduciary failures would have been identified and remedied, and the losses suffered by the Plan would have been avoided or significantly reduced.

## COUNT IV

**Alternative Claim: Knowing Participation in Breach of Trust**
**ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**Against All Defendants**

199.    Plaintiffs incorporate by reference paragraphs 1-178 as though fully set forth herein.

200.    In the alternative, to the extent that any Defendant is not deemed to be a fiduciary or co-fiduciary under ERISA for any purpose, each such Defendant knowingly participated in the

breaches of fiduciary duty alleged herein and should be enjoined or otherwise subjected to appropriate equitable relief under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).

201. All Defendants possessed the knowledge and information necessary to recognize the breaches of fiduciary duty alleged herein—including the Challenged Funds' persistent underperformance and Defendants' retention of MSIM as a party-in-interest service provider in the face of documented underperformance—and knowingly participated in those breaches by permitting the Plan to offer and maintain a menu of imprudent investment options, which conduct was unjustifiable in light of the size and characteristics of the Plan and the fiduciaries' obligations under ERISA.

### COUNT V
**Prohibited Transactions**
**ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C)**
**Against the Investment Committee and American Express Company**

202. Plaintiffs incorporate by reference paragraphs 1-178 as though fully set forth herein.

203. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), prohibits a fiduciary from causing a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

204. Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000); 29 U.S.C. § 1002(14). As an entity providing investment management services to the Plan, MSIM is a party in interest. 29 U.S.C. § 1002(14)(B). The Plan's Form 11-K

filed with the Securities and Exchange Commission further designates "Morgan Stanley Investment Management and its affiliates" as parties-in-interest to the Plan. *See* American Express Retirement Savings Plan, Annual Report (Form 11-K), Note 8, at 15 (Dec. 31, 2024).

205.    By causing the Plan to retain MSIM as an active investment manager of the International Equity Fund despite the IEF's persistent underperformance and despite the pervasive commercial relationships between American Express and Morgan Stanley detailed above, and by causing the Plan to pay MSIM investment management fees for those services—which, as reported on the Plan's 2024 Form 5500 Schedule C, totaled at least $1,918,448 in 2024 alone—Defendants caused the Plan to engage in transactions that they knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C). Each payment of investment management fees by the Plan to MSIM during the Class Period constituted a separate violation of § 1106(a)(1)(C).

206.    Total losses to the Plan will be determined after complete discovery. Under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are jointly and severally liable to restore to the Plan all losses resulting from these prohibited transactions, to provide restitution of all proceeds of these prohibited transactions, and are subject to such other equitable or remedial relief as the Court deems appropriate.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of themselves, the Plan, and the Class, respectfully request that the Court:

a)    Find and adjudge that Defendants breached their fiduciary duties of prudence and loyalty under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), and their co-fiduciary duties under ERISA Section 405(a), 29 U.S.C. § 1105(a), as alleged herein;

b)      Find and adjudge that Defendants caused the Plan to engage in prohibited transactions with Morgan Stanley Investment Management, Inc., a party-in-interest, in violation of ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C);

c)      Find and adjudge that Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach of fiduciary duty, and each prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches;

d)      Order Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

e)      Order Defendants to make good to the Plan any profits resulting from each breach of prohibited transaction and to disgorge any profits realized from the prohibited transactions;

f)      Order Defendants to restore to the Plan all investment management fees and other compensation paid from Plan assets to Morgan Stanley Investment Management, Inc. during the Class Period, together with the investment returns that would have been earned on those amounts had they remained invested for the benefit of Plan participants, pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

g)      Find and adjudge that Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

h)      Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

i)    Order the Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C.§ 1109(a);

j)    Order injunctive and declaratory relief under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), including an order: (i) requiring Defendants to replace the Challenged Funds with prudently selected investment alternatives; (ii) requiring Defendants to implement a sound, documented investment monitoring process consistent with ERISA's standards; and (iii) prohibiting Defendants from selecting or retaining investment options for the Plan where a material conflict of interest exists unless appropriate conflict-management procedures are in place;

k)    Certify the Class, appoint the Plaintiffs as class representatives, appoint Milberg, PLLC, Chirinos Law Firm PLLC, and Stiegler Law Firm LLC as lead counsel for the Class;

l)    Award pre-judgment and post-judgment interest at the maximum permissible rates;

m)    Award to the Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1), and/or as otherwise permitted by law; and

n)    Grant such other and further relief as the Court deems just, proper, and equitable under the circumstances, including the removal of the fiduciaries who have breached their fiduciary duties and enjoining them from future ERISA violations.

May 15, 2026                              Respectfully submitted,

                                         */s/Nicole M. Cvercko*
                                         Nicole M. Cvercko, Bar No. 6050629
                                         **CHIRINOS LAW FIRM PLLC**
                                         11 Broadway, Suite 615
                                         New York, NY 10004
                                         Telephone: 646-559-9952
                                         Email: ncvercko@chirinoslawfirm.com

                                         **MILBERG, PLLC**
                                         Ryan M. Tucker*
                                         Alexandr Rudenco*
                                         800 S. Gay St., Suite 1100
                                         Knoxville, TN 37929
                                         Tel: (865) 247-0080
                                         rtucker@milberg.com
                                         arudenco@milberg.com

                                         **CHIRINOS LAW FIRM PLLC**
                                         Tulio D. Chirinos*
                                         20283 State Road 7, Suite 592
                                         Boca Raton, Florida 33498
                                         Telephone: (561) 299-6334
                                         tchirinos@chirinoslawfirm.com

                                         **STIEGLER LAW FIRM LLC**
                                         Charles J. Stiegler*
                                         318 Harrison Ave., #104
                                         New Orleans, La. 70124
                                         Telephone: (504) 267-0777
                                         charles@stieglerlawfirm.com

                                         *Pro Hac Vice Application Forthcoming*

                                         *Attorneys for Plaintiffs and the Proposed Class*

63